Nathan J. Kunz (024819)
nkunz@brodygapp.com
Scott M. Harkless (pro hac vice application forthcoming)
scott@brodygapp.com
BRODY | GAPP LLP
2102 Business Center Drive, Suite 2047
Irvine, CA  92612
Telephone: (415) 246-3995

*Attorneys for Plaintiff CalCon Mutual Mortgage, LLC dba OneTrust Home Loans*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| CalCon Mutual Mortgage LLC d/b/a OneTrust Home Loans, a Delaware limited liability company, <br><br>      Plaintiff, <br> vs. <br> E Mortgage Capital, Inc., a California corporation; <br> United Wholesale Mortgage, LLC, a Michigan limited liability company; <br> Cory Ouellette, an individual; <br> Andrew Lemon, an individual; <br> Rod Neale, an individual; <br> Matthew Adams, an individual; <br> James Stephens, an individual; <br> Andrew Klein, an individual; <br> Dustin Schaffer, an individual; <br> Shawn Heinmiller, an individual; <br> Tory Erickson, an individual; <br> Ryan Hull, an individual; <br> Jeff Sosa, an individual; <br> Kyle Tudi, an individual; <br> Casey Weaver, an individual; <br> Jarrett Bain, an individual; <br> Austin Auch, an individual; <br> Maverick Veres, an individual; <br> Jakob Saenz-Correa, an individual; <br> Samuel Ripple, an individual; <br> Chris Litto, an individual; <br> Jadon Olson, an individual; | Case No.: <br><br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

1

COMPLAINT

Jacob Vesecky, an individual;
Matt Jolly, an individual;
Karla Grajeda, an individual;
Ron Kasapi, an individual;
Andrew de la Cruz, an individual;
Dustin Potempa, an individual;
Tina Vesecky, an individual;
Samantha Pearce, an individual;
Nathan Chestnut, an individual;
Tanei Bain, an individual;
Danielle Toglena, an individual; and DOES
1 through 50, inclusive,

     Defendants.

## NATURE OF THE ACTION

1. Plaintiff CalCon Mutual Mortgage LLC d/b/a OneTrust Home Loans ("CalCon") brings this action arising from a coordinated scheme orchestrated by Defendants to recruit and transition CalCon employees, divert CalCon-originated borrower information and mortgage loan opportunities, misuse CalCon's confidential and trade secret information, and preserve and monetize diverted loan activity through unauthorized third-party technology systems and competing lending channels associated with Defendants E Mortgage Capital, Inc. ("EMC") and United Wholesale Mortgage, LLC ("UWM").

2. While still employed by CalCon and owing continuing contractual, fiduciary, confidentiality, and loyalty obligations to CalCon, certain employees of the AZ Division coordinated with EMC and UWM to transition employees and business operations away from CalCon, including through the use of unauthorized systems and concealed off-platform routing activity designed to divert mortgage applications and borrower information outside CalCon's authorized systems and visibility. Through the conduct alleged herein, Defendants improperly obtained and exploited the benefit of CalCon's employees, borrower information, loan opportunities, confidential information,

trade secrets, goodwill, and business infrastructure for Defendants' own financial gain and competitive advantage and to CalCon's detriment.

**PARTIES**

3.      Plaintiff CalCon Mutual Mortgage LLC, doing business as OneTrust Home Loans ("CalCon"), is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in San Diego County, California.

4.      CalCon's sole member is Warp Speed Holdings, LLC, a limited liability company organized under the laws of the State of Wyoming. CalCon provides mortgage lending and related services throughout the United States, including in Arizona.

5.      Defendant E Mortgage Capital, Inc. ("EMC") is a California corporation with a registered office located at 3750 South Susan Street, Santa Ana, California 92704. EMC conducts substantial mortgage lending, brokerage, and/or related business operations in Arizona and, as alleged herein, employed or affiliated with certain former members of CalCon's Arizona Division after their departure from CalCon.

6.      Defendant United Wholesale Mortgage, LLC ("UWM") is a Michigan limited liability company with a registered office located at 40600 Ann Arbor Road East, Suite 201, Plymouth, Michigan 48170. UWM conducts substantial mortgage lending, wholesale lending, and/or related business operations in Arizona and, as alleged herein, participated in and benefited from the diversion of CalCon borrowers and prospective loan opportunities.

7.      Defendant Cory Ouellette ("Ouellette") is an individual who is believed to reside in Arizona. Ouellette was formerly employed by CalCon as a member of its Arizona Division and, after his departure from CalCon, became employed by or affiliated with EMC.

8.      Defendant Andrew Lemon ("Lemon") is an individual who is believed to reside in Arizona. Lemon was formerly employed by CalCon as a Vice President of its Arizona Division.

9. Defendants Ouellette and Lemon are referred to collectively herein as the "AZ Division Leader Defendants."

10. Defendant Rod Neale ("Neale") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

11. Defendant Matthew Adams ("Adams") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

12. Defendant James Stephens ("Stephens") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

13. Defendant Andrew Klein ("Klein") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

14. Defendant Dustin Schaffer ("Schaffer") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

15. Defendant Shawn Heinmiller ("Heinmiller") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

16. Defendant Tory Erickson ("Erickson") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

17. Defendant Ryan Hull ("Hull") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

18.. Defendant Jeff Sosa ("Sosa") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

19. Defendant Kyle Tudi ("Tudi") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

20. Defendant Casey Weaver ("Weaver") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

21. Defendant Jarrett Bain ("J. Bain") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

22. Defendant Austin Auch ("Auch") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

23. Defendant Maverick Veres ("Veres") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

24. Defendant Jakob Saenz-Correa ("Saenz-Correa") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

25. Defendant Samuel Ripple ("Ripple") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

26. Defendant Chris Litto ("Litto") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

27. Defendant Jadon Olson ("Olson") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

28. Defendant Jacob Vesecky ("J. Vesecky") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

29. Defendant Matt Jolly ("Jolly") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

30.. Defendant Karla Grajeda ("Grajeda") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

31. Defendant Ron Kasapi ("Kasapi") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

32. Defendant Andrew De La Cruz ("De La Cruz") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

33. Defendant Dustin Potempa ("D. Potempa") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

34. Defendant Tina Vesecky ("T. Vesecky") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

35. Defendant Samantha Pearce ("Pearce") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a Branch Operations Manager of its Arizona Division.

36. Defendant Nathan Chestnut ("Chestnut") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

37. Defendant Tanei Bain ("T. Bain") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

38. Defendant Danielle Toglena ("Toglena") is an individual who is believed to reside in Arizona and was formerly employed by CalCon as a member of its Arizona Division.

39. Defendants Ouellette, Lemon, Neale, Adams, Stephens, Klein, Schaffer, Heinmiller, Erickson, Hull, Sosa, Tudi, Weaver, J. Bain, Auch, Veres, Saenz-Correa,

Ripple, Litto, Olson, J. Vesecky, Jolly, Grajeda, Kasapi, De La Cruz, D. Potempa, T. Vesecky, Pearce, Chestnut, T. Bain, and Toglena are referred to collectively herein as the "AZ Division Employee Defendants" or individually as "each AZ Division Employee Defendant."

40. CalCon is presently unaware of the true names and capacities of Defendants sued herein as DOES 1 through 50, inclusive, and therefore sues those Defendants by fictitious names. CalCon is informed and believes, and on that basis alleges, that each DOE Defendant participated in, facilitated, aided and abetted, benefited from, or is otherwise responsible for some portion of the wrongful conduct alleged herein. CalCon will amend this Complaint to identify the DOE Defendants and their capacities when their identities are ascertained.

41. CalCon is informed and believes, and on that basis alleges, that at all relevant times each Defendant acted individually and/or as the agent, employee, representative, co-conspirator, aider and abettor, alter ego, partner, joint venturer, or affiliate of one or more of the other Defendants, and in doing the acts alleged herein acted within the course and scope of that relationship, with the authorization, knowledge, consent, ratification, and/or assistance of one or more other Defendants.

## JURISDICTION AND VENUE

42. Jurisdiction arises under 28 U.S.C. §§ 1331 and 1367 because CalCon asserts claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and CalCon's remaining state-law claims arise from the same nucleus of operative facts and form part of the same case or controversy under Article III of the United States Constitution.

43. Venue is proper in this United States District Court for the District of Arizona because a substantial part of the events and omissions giving rise to these claims occurred in Arizona, including the employment, recruitment, transition, and loan-diversion activities involving the AZ Division Employee Defendants, all of whom were previously employed by CalCon in Arizona.

## FACTUAL ALLEGATIONS

44.    On or around February 2022, Tim Potempa ("Potempa") joined CalCon as a Senior Vice President and leader of the AZ Division. Potempa has been a loan officer for 19 years and is ranked in the top 100 originators nationwide. The Scotsman Guide has ranked him as the #1 FHA Lender[1].  Potempa's employment with CalCon concluded in late March 2024.

45.    During Potempa's employment at CalCon, a team of mortgage professionals joined the AZ Division at CalCon, which consisted of a group of CalCon employees, including loan originators, sales managers, and support personnel, who, by virtue of their roles, had access to CalCon's confidential and proprietary information, not readily ascertainable by others in the mortgage industry. Such protected information includes but is not limited to, prospective, actual and former non-public borrower information, loan application information and supporting documentation, pricing models, business models, vendor fees, internal cost allocations, active loan pipeline, referral sources, software and systems and operational processes used in the origination, processing, and monetization of mortgage loan opportunities in addition to other processes and methods (all such information hereafter referenced as "Trade Secrets").

46.    The Trade Secrets derive independent economic value from not being generally known to competitors because they permit mortgage lenders and brokers to identify, cultivate, process, and monetize borrower information and loan opportunities without independently incurring the substantial time, expense, marketing, staffing, and operational costs required to generate such opportunities. At all relevant times, CalCon developed, maintained, and protected its valuable Trade Secrets.

47.    CalCon employees of the AZ Division included AZ Division Senior Vice President, Tim Potempa, AZ Division Leader Defendants Cory Ouellette and Andrew Lemon, and, among others, the named AZ Division Employee Defendants.

---

[1] See, https://potempateam.com/about/

48.     In about May and June 2025, each of the following former employees of CalCon's Arizona Division filed an individual arbitration demand with the American Arbitration Association ("AAA") against CalCon asserting claims under the Fair Labor Standards Act ("FLSA"): Austin Auch, Brandon Goodwin, Calvin Haynes, Danielle Toglena, Jacob Vesecky, Jadon Olson, Jake Benedict, Jakob Saenz-Correa, James Stephens, Jarrett Bain, Jeff Sosa, Martin Peychev, Matt Jolly, Matthew Adams, Matthew Cooper, Maverick Veres, Ron Kasapi, Samantha Pearce, Samuel Ripple, and Tanei Bain.

49.     In November 2025, based on facts then known concerning misconduct by certain former employees of the Arizona Division, CalCon asserted counterclaims in the AAA proceedings against Austin Auch, Danielle Toglena, Jacob Vesecky, Jadon Olson, James Stephens, Jarrett Bain, Jeff Sosa, Matt Jolly, Matthew Adams, Maverick Veres, Samantha Pearce, Samuel Ripple, and Tanei Bain. Those counterclaims alleged, among other things, breach of contract, unjust enrichment, intentional interference with prospective economic advantage, violations of the Computer Fraud and Abuse Act, and conspiracy.

50.     The AAA proceedings subsequently resulted in the production of approximately five terabytes of electronically stored information, including emails and Microsoft Teams communications generated during the Arizona Division's employment with CalCon. CalCon's review of that material in 2026 revealed previously concealed facts concerning the scope, participants, methods, and beneficiaries of the misconduct alleged in this Complaint, including communications and conduct reflecting coordination with EMC and UWM. Before obtaining and reviewing that material, CalCon did not know, and through reasonable diligence could not have known, the full extent of EMC's and UWM's respective participation in, knowledge of, and benefit from the diversion of CalCon borrowers, loan opportunities, confidential information, and business expectancy.

51.     CalCon took reasonable measures to maintain the secrecy and confidentiality of its Trade Secrets, including through Employment Agreements,

confidentiality provisions, Employee Handbook policies, authentication and access-control measures, technology restrictions, employee training, and the maintenance of dedicated information technology personnel and systems designed to protect CalCon's confidential information, technology, and business operations.

52.    Pursuant to their Employment Agreements and CalCon policies, AZ Division Employee Defendants expressly acknowledged that the Trade Secrets constituted confidential and proprietary information belonging exclusively to CalCon and agreed to use Trade Secrets solely for CalCon's benefit and not to disclose, transfer, misuse, or divert its Trade Secrets or related loan opportunities outside CalCon's authorized systems and operations.

53.    At all relevant times, CalCon's policies and agreements specifically restricted unauthorized access to Company systems, prohibited the installation or use of unapproved software and external communication channels, and required employees to safeguard Company technology, software, and electronic information from unauthorized disclosure, transfer, or use.

54.    Thus, at all relevant times, AZ Division Employee Defendants were prohibited from utilizing unauthorized software, third-party technology platforms, personal communication systems, or external data-routing processes in connection with CalCon borrower information, loan applications, or mortgage operations.

55.    Despite these obligations, AZ Division Employee Defendants utilized unauthorized third-party technology systems and software platforms, including Floify, outside CalCon's authorization and visibility, to facilitate the routing, transfer, preservation, replication, and/or diversion of CalCon-originated borrower information, mortgage applications, and loan opportunities into lending channels associated with EMC and UWM. Further, CalCon is informed and believes that its Trade Secrets, specifically documents related to CalCon's loan pipeline, loan processes, pricing, internal policies, and any other proprietary templates created for the benefit of CalCon, among other Trade

COMPLAINT

Secrets were downloaded by Andrew Lemon for use at EMC. For example, in a March 23, 2024 communication Lemon informed the entire team that departed CalCon to join EMC the following: "We also saved most everything not client related from the shared drive too so if there is anything specific used to complete daily job responsibilities please get with us and we can find and share. In regards to pay or anything related from One Trust please email them direct, I do have a copy of the pipeline saved so we will be able to reconcile any differences." A true and correct copy of this email is attached to this Complaint as Exhibit 1.

56. AZ Division Employee Defendants knew or reasonably should have known that the use of unauthorized third-party technology platforms, including Floify, was prohibited by CalCon.

57. Indeed, upon information and belief, certain AZ Division Employee Defendants had utilized Floify or similar technology platforms while employed by prior mortgage lenders before joining CalCon, but were required by CalCon to discontinue their use of those platforms in favor of CalCon's authorized technology systems, including Blend and other approved platforms. CalCon is further informed and believes that, while Blend and CalCon's other authorized systems were used to conduct legitimate CalCon business, Floify was used by AZ Division Employee Defendants to route borrower leads and loan opportunities away from CalCon and to EMC and/or UWM. Under these circumstances, each AZ Division Employee Defendant knew, or reasonably should have known, that the use of Floify in connection with CalCon-originated borrower information and loan opportunities was unauthorized and intended to facilitate the wrongful diversion of CalCon business.

58. Nevertheless, upon further information and belief, AZ Division Employee Defendants understood that Floify and related systems were being implemented on CalCon technology and integrated with CalCon e-mail platforms or other e-mail

platforms authorized by CalCon for the exclusive furtherance of EMC's business purposes.

59. Upon information and belief, AZ Division Employee Defendants understood that Floify and related systems were being implemented on and integrated with CalCon technology in anticipation of the AZ Division Employee Defendants and Employees' transition to EMC.

60. In an effort to conceal the coordinated scheme from CalCon, AZ Division Employee Defendants excluded other employees of the AZ Division from regular business meetings, communications, and discussions such employees were previously included in and routinely invited to participate in and began using their Potempateam.com email domains for work email and connectivity to the unauthorized software and technology, Floify. CalCon is informed and believes that each of the AZ Division Employee Defendants believed that their use of this email domain would evade detection by CalCon.

61. CalCon is informed and believes, and reasonably infers from its factual allegations, that such exclusion was necessary so that AZ Division Employee Defendants could freely discuss and coordinate the unauthorized use of Trade Secrets, CalCon's technology, the diverting of loan opportunities, the solicitation and recruitment of CalCon employees, and coordination with EMC and UWM outside CalCon's authorized systems and oversight.

62. Because Floify and related third-party systems operated outside CalCon's authorized systems, access controls, and visibility, CalCon could not independently observe or monitor the routing, transfer, replication, preservation, submission, processing, or disposition of Trade Secrets, borrower applications, and mortgage loan opportunities occurring through such third-party platforms.

63. As a result, Defendants' misconduct, including the diversion and misuse of CalCon's Trade Secrets, including but not limited to loan opportunities and borrower

COMPLAINT

information, was inherently difficult to detect and could not reasonably be discovered without later investigation, loan-level analysis, and information obtained from third parties.

64. Beginning in or around late 2023, Tim Potempa, AZ Division Employee Defendants, and others acting in concert with them engaged in coordinated efforts to transition employees, loan opportunities, borrower information, and loan pipeline activity away from CalCon and toward EMC and UWM. These efforts included employee recruitment, onboarding coordination, transfer and preservation of loan opportunities, use of unauthorized technology platforms, and the routing and processing of mortgage applications outside CalCon's authorized systems and oversight.

65. At all relevant times, AZ Division Employee Defendants had executed and were subject to Employment Agreements containing express non-solicitation covenants prohibiting them from recruiting or soliciting CalCon employees to leave CalCon for a competing mortgage lender, including EMC.

66. Pursuant to Schedule D of those Employment Agreements, these employees had expressly agreed that during their employment and for eighteen (18) months thereafter, they would not, directly or indirectly, "employ or solicit for employment any of Company's employees, consultants, or contractors to leave Company; form or join another entity; and/or sever (or cause the termination of) his/her relationship with Company."

67. The Employment Agreements further prohibited these employees from advising or assisting "any other person or entity that is a Competing Organization."

68. EMC and UWM were, at all relevant times, "Competing Organizations" within the meaning of the Employment Agreements. CalCon had no contractual, correspondent, wholesale, brokerage, or other authorized business relationship with either EMC or UWM pursuant to which CalCon borrowers, prospective loan opportunities, active loan pipeline information, supporting loan documentation, or other nonpublic

CalCon information could properly be disclosed, transferred, submitted, or processed by AZ Division employees for the benefit of EMC or UWM. Accordingly, any transmission by AZ Division employees, while still employed by CalCon, of nonpublic information concerning CalCon borrowers or active CalCon loan opportunities to EMC or through EMC to UWM was outside CalCon's authorized business channels and contrary to CalCon's interests.

69.    Upon information and belief, notwithstanding these contractual obligations, Tim Potempa, AZ Division Leader Defendants and the AZ Division Employee Defendants coordinated with EMC and others to recruit, transition, and solicit CalCon employees to leave CalCon and join EMC while still employed by CalCon, while simultaneously leveraging such employees' access to CalCon systems, technology, borrower relationships, and Trade Secrets to divert mortgage loan applications and business opportunities away from CalCon.

70.    Upon information and belief, EMC's communications with AZ Division Employee Defendants included discussions regarding: (1) recruitment and onboarding of employees of the AZ Division; (2) compensation and incentives tied to loan volume and borrower conversion; and (3) the handling, submission, and processing of mortgage loan applications associated with prospective and actual borrowers who were engaged by employees of the AZ Division during their employment at CalCon.

71.    Upon information and belief, UWM knowingly participated in and benefited from coordinated efforts by EMC, AZ Division Leader Defendants and AZ Division Employee Defendants,  to transition loan opportunities, borrower information, and loan pipeline activity away from CalCon by participating in, facilitating, supporting, and/or knowingly benefiting from communications, onboarding activities, transition efforts, and loan submission activities involving EMC, UWM, AZ Division Leaders, and AZ Division Employee Defendants.

COMPLAINT

72.    Upon information and belief, UWM knew that the loan opportunities it was receiving through EMC and Ouellette during February and March 2024 were being generated, handled, or transferred by individuals who remained employed by CalCon. This inference arises from, among other things, the contemporaneous communications identifying CalCon and OneTrust as the existing lender or competing source of the loans; the involvement of AZ Division employees using CalCon or Potempa Team e-mail addresses while still employed by CalCon; UWM's direct interactions with Ouellette, Lemon, and other members of the AZ Division during the transition period; and UWM's processing or approval of loans submitted through EMC during the same period in which active CalCon loan opportunities were being transferred away from CalCon.

73.    Because CalCon had no wholesale, brokerage, correspondent, or other authorized relationship with UWM, UWM knew or consciously disregarded that nonpublic information relating to active CalCon loan opportunities was being supplied outside any authorized CalCon lending channel and for the benefit of CalCon's competitor.

74.    Upon further information and belief, UWM knowingly received loan opportunities from AZ Division Employee Defendants despite knowing that CalCon did not maintain a mortgage brokerage relationship with UWM and further knowing, or being willfully blind to the fact, that such loan opportunities originated from CalCon personnel, systems, borrower information, and pipeline activity and were being redirected for the benefit of EMC and UWM rather than CalCon.

75.    UWM engaged in such conduct to generate profit from diverted loan opportunities and to strengthen and expand its business relationship with EMC and the AZ Division Employee Defendants.

76.    Upon information and belief, prior to the departure of the AZ Division from CalCon, AZ Division Employee Defendants coordinated to divert and preserve CalCon-

originated loan opportunities through mortgage brokerage and wholesale lending channels associated with Defendant UWM and Defendant EMC.

77. Specifically, AZ Division Employee Defendants utilized UWM's wholesale lending platform and broker relationship with EMC to receive, process, preserve, maintain, route and/or hold mortgage loan applications and borrower opportunities originating from CalCon while they remained employed by CalCon.

78. Upon further information and belief, such loan opportunities were intentionally routed through UWM and associated EMC channels so the loans could later be transitioned, completed, funded, or monetized after AZ Division Employee Defendants formally separated from CalCon and joined EMC.

79. Defendants undertook these actions while knowing that the loan opportunities, borrower information, and pipeline activity originated through CalCon's systems, personnel, marketing efforts, and confidential business information, and while further knowing that AZ Division Employee Defendants remained subject to licensing, contractual, fiduciary, confidentiality, and non-solicitation obligations owed to CalCon.

80. Upon information and belief, AZ Division Employee Defendants utilized unauthorized third-party systems, such as Floify, and lending channels to receive, transfer, preserve, process, and/or submit mortgage applications and borrower information originating from CalCon, including applications and borrower information that had been cultivated, initiated, developed, or maintained by members of the AZ Division while employed by CalCon.

81. Upon information and belief, while still employed by CalCon and owing continuing contractual and fiduciary obligations to CalCon, AZ Division Employee Defendants coordinated the transition of loan opportunities, borrower information, employees, and business operations to EMC and related UWM lending channels in anticipation of their collective departure from CalCon in March 2024 or in the case of Defendant Ouellette, February 2024.

82. In February 2024, Defendant Ouellette was the first employee of the AZ Division to leave CalCon and join EMC. Ouellette departed first to serve as a coordinating liaison at EMC, assisting with employment transition for the AZ Division Employees who followed and coordinating with EMC and UWM to process all prospective borrowers away from CalCon to UWM or EMC.

83. As a result of Defendants' scheme, by the end of March 2024, the AZ Division Employee Defendants left employment with CalCon and joined EMC.

84. Further, numerous CalCon-originated borrower inquiries, borrower information, mortgage applications, and prospective loan opportunities were diverted away from CalCon and routed to EMC and/or through lending channels associated with UWM, either through the direct conduct of an AZ Division Leader Defendant, the direct conduct of or assistance provided by an AZ Division Employee Defendant, and/or the unauthorized connection to and use of Floify in conjunction with CalCon-controlled computer systems, electronic mail accounts, borrower-intake processes, and related technology infrastructure.

85. The allegations concerning solicited borrowers set forth in paragraph 83 derive from a March 12, 2024, e-mail titled "MARCH NUMBERS SO FAR," sent by Tim Potempa to employees of the AZ Division. A true and correct copy of this email communication is attached to this Complaint as **Exhibit 2**.

86. CalCon did not discover this e-mail until May 2026, during an investigation and review of approximately five terabytes of AZ Division employee e-mail data.

87. The March 12, 2024, e-mail, like other communications relating to the AZ Division Employee Defendants' misconduct, was transmitted through e-mail addresses using the Potempateam.com domain rather than the employees' assigned onetrusthomeloans.com e-mail accounts.

88. Although both domains were controlled by CalCon and subject to CalCon's inspection, CalCon is informed and believes that the AZ Division Employee Defendants

used the Potempateam.com domain in an effort to avoid ordinary oversight of their OneTrust communications, believing that communications transmitted through the Potempateam.com domain would evade detection in the event of an investigation.

89.    Rod Neale became a CalCon employee and member of the AZ Division on September 9, 2022, and concluded his employment on March 22, 2024.

90.    As of March 12, 2024, and prior to his departure, Neale had solicited at least seven borrowers away from CalCon to EMC representing a total loan amount of $2,335,420.

91.    CalCon is informed and believes that Neale used Floify to facilitate the diversion of these and other CalCon loan opportunities and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

92.    Matthew Adams  became a CalCon employee and member of the AZ Division on October 24, 2022, and concluded his employment on March 22, 2024.

93.    As of March 12, 2024, and prior to his departure, Adams had solicited at least six borrowers away from CalCon to EMC representing a total loan amount of $2,489,975. *See* Exhibit 2.

94.    CalCon is informed and believes that Adams used Floify to facilitate the diversion of these and other CalCon loan opportunities to EMC or UWM and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

95.    In a March 29, 2024, email titled [borrower name redacted] REFI, Adams sent an e-mail to Andrew Lemon and Ouellette and the disclosuredesk@potempateam.com, seeking the transfer and loan processing of a prospective borrower away from CalCon to EMC. A true and correct copy of this communication is attached to this Complaint as **Exhibit 3**.

96. James Stephens became a CalCon employee and member of the AZ Division on March 1, 2022, and concluded his employment on March 22, 2024.

97. As of March 12, 2024, and prior to his departure, Stephens had solicited at least six borrowers away from CalCon to EMC representing a total loan amount of $3,822,813. See Exhibit 2.

98. CalCon is informed and believes that Stephens used Floify to facilitate the diversion of these and other CalCon loan opportunities to EMC or UWM and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

99. In further evidence of Lemon and Oulette's coordination with Stephens and others, on March 6, 2024, in an email related to Loan No. XX9108 (borrower name redacted to protect privacy), a true and correct copy of which is attached to this Complaint as **Exhibit 4**, Stephens indicates that he "just set up deal and sent over to lemon and cory on this. UWM beats the MC sent and one trust by over 1 point. Lemon priced out earlier when I was in his office."

100. Ouellette, now an EMC employee, responds on March 7, 2024, "Please send me their supporting docs. I am sending accountchek right now and appraisal request form." CalCon did not discover this e-mail until May 2026.

101. In further evidence of Stephens' solicitation of CalCon borrowers, Stephens sent a CalCon prospective borrower an email on March 26, 2024 requesting the borrower to access his Floify website so he can complete his application for Stephens now that he is at EMC.

102. Stephens provides that Sarah Ramos will assist the borrower in completing his loan application at EMC, away from CalCon. A true and correct copy of this communication is attached to this Complaint as **Exhibit 5**.

103. Andrew Klein became a CalCon employee and member of the AZ Division on March 1, 2022, and concluded his employment on March 22, 2024.

104. As of March 12, 2024, and prior to his departure, Klein had solicited at least four borrowers away from CalCon to EMC representing a total loan amount of $1,219,682. See Exhibit 2.

105. CalCon is informed and believes that Klein used Floify to facilitate the diversion of these and other CalCon loan opportunities to EMC or UWM and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

106. One example of Klein diverting and working on loans for UWM while employed by CalCon is found in a March 5, 2024, Teams group chat wherein Klein indicated that he was unable to assist a team member, because he was "too busy with all the loans now at UWM." A true and correct copy of this communication is attached to this Complaint as **Exhibit 6**.

107. Dustin Schaffer became a CalCon employee and member of the AZ Division on March 1, 2022, and concluded his employment on March 22, 2024.

108. As of March 12, 2024, and prior to his departure, Schaffer had solicited at least three borrowers away from CalCon to EMC representing a total loan amount of $825,142. See Exhibit 2.

109. CalCon is informed and believes that Schaffer used Floify to facilitate the diversion of these and other CalCon loan opportunities to EMC or UWM and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

110. Shawn Heinmiller became a CalCon employee and member of the AZ Division on March 1, 2022, and concluded his employment on March 22, 2024.

111. As of March 12, 2024, and prior to his departure, Heinmiller had solicited at least three borrowers away from CalCon to EMC representing a total loan amount of $789,750. See Exhibit 2.

112.   CalCon is informed and believes that Heinmiller used Floify to facilitate the diversion of these and other CalCon loan opportunities to EMC or UWM and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

113.   Tory Erickson became a CalCon employee and member of the AZ Division on August 7, 2023, and concluded her employment on March 22, 2024.

114.   As of March 12, 2024, and prior to her departure, Erickson had solicited at least three borrowers away from CalCon to EMC representing a total loan amount of $1,206,670. See Exhibit 2.

115.   CalCon is informed and believes that Erickson used Floify to facilitate the diversion of these and other CalCon loan opportunities to EMC or UWM and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

116.   Ryan Hull became a CalCon employee and member of the AZ Division on May 16, 2022, and concluded his employment on March 15, 2024.

117.   As of March 12, 2024, and prior to his departure, Hull had solicited at least two borrowers away from CalCon to EMC representing a total loan amount of $491,500. See Exhibit 2.

118.   CalCon is informed and believes that Hull used Floify to facilitate the diversion of these and other CalCon loan opportunities to EMC or UWM and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

119.   Cory Ouellette became a CalCon employee and a leader of CalCon's AZ Division on or about April 1, 2022.

120.   His employment with CalCon ended on or about February 1, 2024, after which he began employment with EMC.

121.    By no later than March 12, 2024, Ouellette had solicited at least two borrowers away from CalCon for the benefit of EMC, involving loans with a combined principal amount of approximately $1,452,000. See Exhibit 2.

122.    CalCon is informed and believes that Ouellette used Floify to facilitate the diversion of these and other CalCon loan opportunities to EMC or UWM and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

123.    After leaving CalCon and joining EMC in or about February 2024, Ouellette coordinated with employees who remained employed within CalCon's AZ Division to divert CalCon borrowers and prospective loan opportunities to EMC and/or UWM.

124.    Ouellette's coordination with remaining AZ Division Defendant Employees is reflected, among other documents attached here or as otherwise alleged, in a Teams group chat posted by Sosa on February 14, 2024, a true and correct copy of which is attached to this Complaint as **Exhibit 7**, as well as in the allegations concerning Andrew Lemon set forth below and the related communication attached as Exhibit 11.

125.    Ouellette's involvement in the diversion of CalCon loan opportunities to EMC through UWM is further evidenced by a March 7, 2024, e-mail sent by UWM's National Sales Director Brandon Dobos to Ouellette at his Potempateam.com e-mail address, with the subject line, "Congratulations on your 1-day Approval!" A true and correct copy of that e-mail is attached to this Complaint as **Exhibit 8**.

126.    In that e-mail, Dobos congratulated Ouellette and EMC concerning the referenced loan approval.

127.    CalCon is informed and believes, and on that basis alleges, that the loan referenced in Dobos's March 7, 2024 e-mail was a CalCon borrower or prospective loan opportunity that had been diverted, with the use of Floify, to EMC and/or UWM as part of the coordinated diversion scheme alleged herein. This allegation is based on, among

other things, the timing of the e-mail shortly after Ouellette's departure from CalCon and commencement of employment with EMC; the identity of the sender, recipients, and entities referenced in the e-mail; the subject matter of the e-mail; Ouellette's documented solicitation of CalCon borrowers during the same period; and surrounding communications reflecting coordination with employees who remained within CalCon's AZ Division.

128.   CalCon did not discover Dobos's March 7, 2024, e-mail until May 2026, during CalCon's investigation and review of approximately five terabytes of e-mail data associated with AZ Division employees.

129.   Jeff Sosa became a CalCon employee and member of the AZ Division on March 1, 2022, and concluded his employment on March 22, 2024.

130.   As of March 12, 2024, and prior to his departure, Sosa had solicited at least two borrowers away from CalCon to EMC representing a total loan amount of $764,850. See Exhibit 2.

131.   CalCon is informed and believes that Sosa used Floify to facilitate the diversion of these and other CalCon loan opportunities to EMC or UWM and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

132.   As further evidence of Sosa's coordination with Defendants Ouellette and EMC to divert loan opportunities away from CalCon to EMC, on March 7, 2024, Sosa responded, with Ouellette on copy, from his "onetrusthomeloans.com" e-mail domain to an escrow officer's introduction to assist with a loan transaction [borrowers name redacted], providing "Thank you for the introduction. I am adding on my VP of Sales, @CoryOuellette, as well as my preferred email address [jsosa@potempateam.com]." A true and correct copy of this email is attached to this Complaint as **Exhibit 9**.

133.   CalCon is informed and believes Sosa used Floify to divert this opportunity away from CalCon to EMC.

134. Additional evidence of coordination and selecting certain loans to stay at CalCon while others would be routed to UWM or EMC can be found in Sosa's February 14, 2024, Teams group chat communication wherein he provided "Moving it today but was talking with Cory about it first…better to keep with OneTrust." A true and correct copy of this communication is attached to the Complaint as **Exhibit 10**.

135. Kyle Tudi became a CalCon employee and member of the AZ Division on October 23, 2023, and concluded his employment on March 22, 2024.

136. As of March 12, 2024, and prior to his departure, Tudi had solicited at least two borrowers away from CalCon to EMC representing a total loan amount of $772,579. See Exhibit 2.

137. CalCon is informed and believes that Tudi used Floify to facilitate the diversion of these and other CalCon loan opportunities to UWM or EMC and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

138. Casey Weaver became a CalCon employee and member of the AZ Division on July 31, 2023, and concluded his employment on March 22, 2024.

139. As of March 12, 2024, and prior to his departure, Weaver had solicited at least one borrower away from CalCon to EMC representing a total loan amount of $288,315. See Exhibit 2.

140. CalCon is informed and believes that Weaver used Floify to facilitate the diversion of these and other CalCon loan opportunities to UWM or EMC and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

141. Andrew Lemon became a CalCon employee and Vice President of the AZ Division on or about March 1, 2022, and remained employed by CalCon until March 22, 2024.

142. By no later than March 12, 2024, while he was still employed by CalCon and serving as a Vice President of the AZ Division, Lemon had solicited and diverted at least one CalCon borrower and corresponding loan opportunity to EMC, involving a loan amount of approximately $385,000. See Exhibit 2.

143. CalCon is informed and believes that Lemon used Floify to facilitate the diversion of these and other CalCon loan opportunities to EMC or UWM and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Ouellette to solicit CalCon employees.

144. Upon information and belief, Ouellette served as the coordinating principal at EMC for the diversion of CalCon loan opportunities to EMC and UWM, while Lemon, before his departure from CalCon, served as the corresponding coordinating principal within CalCon's AZ Division.

145. In that role, Lemon used his position, access, and communications with AZ Division personnel to facilitate the diversion of CalCon borrowers and loan opportunities away from CalCon for the benefit of EMC and UWM.

146. For example, on February 26, 2024, while still employed by CalCon, Lemon transmitted a Microsoft Teams communication to AZ Division employees concerning loans being diverted from CalCon through the unauthorized use of Floify. A true and correct copy of that communication, with borrower names redacted to protect their privacy, is attached to this Complaint as **Exhibit 11**.

147. In the communication, Lemon identified at least eleven loans that he and Ouellette had assisted Defendants Schaffer, Ripple, Heinmiller, Vesecky, Stephens, Auch, Weaver, Adams, and Klein in diverting from CalCon, totaling approximately $3,761,190 in loan volume.

148. Lemon advised the AZ Division that the eleven loans "…are loans I know we have live at EMC, please check this list and IF you have one you sent to Cory or

25
COMPLAINT

myself and don't see it here, please EMAIL me the client name, email and cond contract if applicable to get set up today."

149. Further evidencing Lemon's coordination to transition the AZ Division employees to EMC and facilitate the diversion of CalCon borrowers, Lemon sent a Microsoft Teams message on February 20, 2024, to the future EMC employees providing "Heads up you will be getting an invite to your potempa.com emails for property profile account for when we move to EMC…" A true and correct copy of this communication is attached to this Complaint as **Exhibit 12**. CalCon did not discover this communication until May 2026.

150. In support of the scheme to divert loans away from CalCon, Lemon coordinated meetings and lunches with AZ Division employees and Brandon Dobos of UWM. For example, on March 6, 2024, Lemon informed the team on a group chat that Dobos of UWM was supplying lunch the following day which was "loved" by Chestnut, De La Cruz and T. Bain, and T. Vesecky responded "Awesome." A true and correct copy of the communication is attached to this Complaint as **Exhibit 13**.

151. CalCon is informed and believes this UWM lunch was attended on March 7, 2024, by Defendants Lemon, T. Vesecky, Teresa Defreitas, Andrew De La Cruz, Nathan Chestnut, Danielle Toglena, T. Bain and Matt Jolly.

152. Jarrett Bain became a CalCon employee and member of the AZ Division on March 1, 2022, and concluded his employment on March 22, 2024.

153. As of March 12, 2024, and prior to his departure, J. Bain had solicited at least eight borrowers away from CalCon to EMC representing a total loan amount of $2,499,388. See Exhibit 2.

154. CalCon is informed and believes that J. Bain used Floify to facilitate the diversion of these and other CalCon loan opportunities to UWM or EMC and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

155.    In further evidence of J. Bain's use of Floify to covertly assist the diversion of loan opportunities, can be found in an email from "support@floify.com, dated January 23, 2024, to, among others AZ Division Defendants, J. Bain indicating that a new prospect [borrower name redacted] had been uploaded. CalCon is informed and believes this loan opportunity was diverted from CalCon to UWM for the benefit of EMC. A true and correct copy of this Floify email is attached to this Complaint as **Exhibit 14.**

156.    Austin Auch became a CalCon employee and member of the AZ Division on March 1, 2022, and concluded his employment on March 22, 2024.

157.    As of March 12, 2024, and prior to his departure, Auch had solicited at least six borrowers away from CalCon to EMC representing a total loan amount of $2,368,872. See Exhibit 2.

158.    CalCon is informed and believes that Auch used Floify to facilitate the diversion of these and other CalCon loan opportunities to UWM or EMC and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

159.    In further evidence of Auch's use of Floify to covertly assist the diversion of loan opportunities, can be found in an email from "support@floify.com, dated January 23, 2024, to among others AZ Division Employee Defendants, to Auch indicating that a new prospect [borrower name redacted] had been uploaded. CalCon is informed and believes this loan opportunity was diverted from CalCon to UWM for the benefit of EMC. See Exhibit 14.

160.    Maverick Veres became a CalCon employee and member of the AZ Division on April 24, 2023, and concluded his employment on March 22, 2024.

161.    As of March 12, 2024, and prior to his departure, Veres had solicited at least five borrowers away from CalCon to EMC representing a total loan amount of $1,545,249. See Exhibit 2.

162.   CalCon is informed and believes that Veres used Floify to facilitate the diversion of these and other CalCon loan opportunities to UWM or EMC and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

163.   In further evidence of Veres use of Floify to covertly assist the diversion of loan opportunities, can be found in an email from "support@floify.com, dated January 23, 2024, to among others AZ Division Defendants, to Veres indicating that a new prospect [borrower name redacted] had been uploaded. CalCon is informed and believes this loan opportunity was diverted from CalCon to UWM for the benefit of EMC. See Exhibit 14.

164.   Jakob Saenz-Correa became a CalCon employee and member of the AZ Division on March 1, 2022, and concluded his employment on March 22, 2024.

165.   As of March 12, 2024, and prior to his departure, Saenz-Correa had solicited at least five borrowers away from CalCon to EMC representing a total loan amount of $2,799,500. See Exhibit 2.

166.   CalCon is informed and believes that Saenz-Correa used Floify to facilitate the diversion of these and other CalCon loan opportunities to UWM or EMC and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

167.   Samuel Ripple became a CalCon employee and member of the AZ Division on February 6, 2023, and concluded his employment on March 22, 2024.

168.   As of March 12, 2024, and prior to his departure, Ripple had solicited at least four borrowers away from CalCon to EMC representing a total loan amount of $1,730,825. See Exhibit 2.

169.   CalCon is informed and believes that Ripple used Floify to facilitate the diversion of these and other CalCon loan opportunities to UWM or EMC and provided

assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

170. In further evidence of Ripple's use of Floify to covertly assist the diversion of loan opportunities, can be found in an email from "support@floify.com, dated January 23, 2024, to among others AZ Division Defendants, to Ripple indicating that a new prospect [borrower name redacted] had been uploaded. CalCon is informed and believes this loan opportunity was diverted from CalCon to UWM for the benefit of EMC. See Exhibit 14.

171. Chris Litto became a CalCon employee and member of the AZ Division on September 11, 2023, and concluded his employment on March 22, 2024.

172. As of March 12, 2024, and prior to his departure, Litto had solicited at least four borrowers away from CalCon to EMC representing a total loan amount of $1,333,500. See Exhibit 2.

173. CalCon is informed and believes that Litto used Floify to facilitate the diversion of these and other CalCon loan opportunities to UWM or EMC and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

174. In further evidence of Litto's use of Floify to covertly assist the diversion of loan opportunities, can be found in an email from "support@floify.com, dated January 23, 2024, to among others AZ Division Defendants, to Litto indicating that a new prospect [borrower name redacted] had been uploaded. CalCon is informed and believes this loan opportunity was diverted from CalCon to UWM for the benefit of EMC. See Exhibit 14.

175. Jadon Olson became a CalCon employee and member of the AZ Division on March 1, 2022, and concluded his employment on March 22, 2024.

176. As of March 12, 2024, and prior to his departure, Olson had solicited at least three borrowers away from CalCon to EMC representing a total loan amount of $1,374,820. See Exhibit 2.

177.    CalCon is informed and believes that Olson used Floify to facilitate the diversion of these and other CalCon loan opportunities to UWM or EMC and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

178.    In further evidence of Olson's use of Floify to covertly assist the diversion of loan opportunities, can be found in an email from "support@floify.com, dated January 23, 2024, to among others AZ Division Defendants, to Olson indicating that a new prospect [borrower name redacted] had been uploaded. CalCon is informed and believes this loan opportunity was diverted from CalCon to UWM for the benefit of EMC. See Exhibit 14.

179.    Jacob Vesecky became a CalCon employee and member of the AZ Division on July 18, 2022, and concluded his employment on March 22, 2024.

180.    As of March 12, 2024, and prior to his departure, J. Vesecky had solicited at least two borrowers away from CalCon to EMC representing a total loan amount of $513,850. See Exhibit 2.

181.    CalCon is informed and believes that Vesecky used Floify to facilitate the diversion of these and other CalCon loan opportunities to UWM or EMC and provided assistance to the coordinated efforts made by EMC and the AZ Division Leader Defendants to solicit CalCon employees.

182.    In further evidence of J. Vesecky's use of Floify to covertly assist the diversion of loan opportunities, can be found in an email from "support@floify.com, dated January 23, 2024, to among others AZ Division Defendants, to J. Vesecky indicating that a new prospect [borrower name redacted] had been uploaded. CalCon is informed and believes this loan opportunity was diverted from CalCon to UWM for the benefit of EMC. See Exhibit 14.

183.    Matt Jolly became a CalCon employee and member of the AZ Division on March 1, 2022, and concluded his employment on March 11, 2024.

184. As a loan production assistant, CalCon is informed and believes that Jolly used Floify and otherwise assisted the diversion of CalCon borrowers away from CalCon to UWM and EMC.

185. For example, in a February 21, 2024, e-mail exchange between Regina Ceja of EMC, Defendant Ouellette (now an EMC employee), and Defendants Heinmiller and Jolly, among others, discuss the transfer of a CalCon VA loan to EMC.

186. The email exchange which begins on February 1, 2024, reflects substantial coordination between Tim Potempa, Defendant EMC and AZ Division Leader Defendants Ouellette and Lemon to solicit CalCon employees and seek such employee's assistance to divert loans to UWM and EMC. A true and correct copy of this email exchange is attached to this Complaint as **Exhibit 15**.

187. Karla Grajeda became a CalCon employee and member of the AZ Division on March 1, 2022, and concluded her employment on March 11, 2024.

188. As Tim Potempa's executive assistant, CalCon is informed and believes that Grajeda facilitated the solicitation and onboarding of employees from CalCon to EMC, the diversion of CalCon borrowers to EMC, and the unauthorized onboarding and use of Floify to achieve these ends.

189. For example, on January 17, 2024, Grajeda sent an email to entire AZ Division to assist them in linking their Potempateam.com gmail accounts to Floify. The email is attached to this Complaint as **Exhibit 16**.

190. To assist EMC in the solicitation of CalCon employees, on February 16, 2024, Grajeda sent an email to employees of the AZ Division titled "Benefits Zoom Call – E Mortgage Open Enrollment Meeting." A true and correct copy of this email is attached to this Complaint as **Exhibit 17**.

191. The email, or others like it, was sent to the AZ Division employees, including the AZ Division Employee Defendants, that were recruited to EMC to inform

CalCon employees during their workday (10-11:30am) of EMC's benefits value proposition and to support such enrollment.

192. Ron Kasapi became a CalCon employee and member of the AZ Division on or about February 6, 2023, and remained employed by CalCon until March 22, 2024.

193. CalCon is informed and believes that Kasapi facilitated the solicitation and onboarding of employees from CalCon to EMC, the diversion of CalCon borrowers to EMC, and the onboarding and use of Floify to achieve these ends.

194. For example, on April 1, 2024, a confused CalCon borrower forwarded an email to Kasapi titled "Fwd: Asset Verification for E Mortgage Capital Inc." asking Kasapi "Do you know anything about this or who it is?" A true and correct copy of this email is attached to this Complaint as **Exhibit 18**.

195. An additional example of the AZ Division's use of Floify in coordination with the potempateam.com email domain is found in a Teams communication exchange with AZ Division leader Tim Potempa and Kasapi, dated January 1, 2024, a true and correct copy of which is attached to this Complaint as **Exhibit 19**.

196. In the communication, Potempa provides that Kasapi is to begin using his Potempateam.com email to receive leads from Floify, and that Floify will email loan docs to prospective borrowers and further clarifies that Grajeda has administrative access to Floify.

197. Potempa explains to Kasapi that the use of Floify, "ensures you will never lose them." CalCon is informed and believes that this was to address Kasapi's fears that any new loan opportunities presented during their employment at CalCon could be lost upon their move to EMC.

198. Andrew De La Cruz became a CalCon employee and member of the AZ Division on or about April 1, 2022, and remained employed by CalCon until March 29, 2024.

199.    CalCon is informed and believes that De La Cruz facilitated the solicitation and onboarding of employees from CalCon to EMC, the diversion of CalCon borrowers to EMC, and the onboarding and use of Floify to achieve these ends.

200.    For example, in the February 17, 2024, communication between Jolly and De La Cruz, both are actively coordinating with each other to transfer a CalCon loan opportunity to Ouellette at EMC. A true and correct copy of this communication is attached to this Complaint as **Exhibit 20**.

201.    Dustin Potempa became a CalCon employee and member of the AZ Division on or about March 1, 2022, and remained employed by CalCon until March 22, 2024.

202.    CalCon is informed and believes that D. Potempa facilitated the solicitation and onboarding of employees from CalCon to EMC, the diversion of CalCon borrowers to EMC, and the onboarding and use of Floify to achieve these ends.

203.    One example of D. Potempa's participation in the use of Floify to divert CalCon borrowers away from CalCon to EMC can be found in an email from support@floify.com, dated February 13, 2024, to among others AZ Division Defendants, to D. Potempa indicating that a new loan [borrower name redacted] had been uploaded.

204.    CalCon is informed and believes this loan opportunity was diverted from CalCon to UWM for the benefit of EMC. A true and correct copy of this Floify email is attached to this Complaint as **Exhibit 21**.

205.    Tina Vesecky became a CalCon employee and member of the AZ Division on or about July 10, 2023, and remained employed by CalCon until March 22, 2024.

206.    CalCon is informed and believes that T. Vesecky facilitated the solicitation and onboarding of employees from CalCon to EMC, the diversion of CalCon borrowers to EMC, and the onboarding and use of Floify to achieve these ends.

207.    One example of T. Vesecky participation in the use of Floify to divert CalCon borrowers away from CalCon to EMC can be found in an email from

support@floify.com, dated March 17, 2024, to among others AZ Division Defendants, to T. Vesecky indicating [Borrower's name redacted] had completed all loan docs for "EMC24030052 (Loan XXX3177)."

208. CalCon is informed and believes this loan opportunity was diverted from CalCon to UWM for the benefit of EMC. A true and correct copy of this Floify email is attached to this Complaint as **Exhibit 22**.

209. Samantha Pearce became a CalCon employee and a Branch Operations Manager of the AZ Division on or about July 10, 2023, and remained employed by CalCon until March 22, 2024.

210. CalCon is informed and believes that Pearce facilitated and participated in the solicitation and onboarding of employees from CalCon to EMC, and assisted in the diversion of CalCon borrowers to EMC, and the onboarding and use of Floify to achieve these ends.

211. Pearce was an active participant, coordinating with other AZ Division employees to ensure they were trained on Floify.

212. In further evidence of Pearce's use of Floify to covertly assist the diversion of loan opportunities, can be found in an email from support@floify.com, dated January 23, 2024, to among others AZ Division Defendants, to Pearce indicating that a new prospect [borrower name redacted] had been uploaded. CalCon is informed and believes this loan opportunity was diverted from CalCon to UWM for the benefit of EMC. See Exhibit 14.

213. One example of Pearce's solicitation and coordination with EMC to onboard and place CalCon employees is found in a March 4, 2024, Teams communication between Pearce and Ashley Jobst.

214. In that communication Pearce indicates that she will seek the placement of Jobst on her team. A true and correct copy of this communication is attached to this Complaint as **Exhibit 23**.

215. Nathan Chestnut became a CalCon employee and a member of the AZ Division on or about April 1, 2022, and remained employed by CalCon until March 22, 2024.

216. CalCon is informed and believes that Chestnut assisted in the solicitation and onboarding of employees from CalCon to EMC, assisted in the diversion of CalCon borrowers to EMC and UWM, and the onboarding and use of Floify to achieve these ends.

217. One example can be found in March 1, 2024, Teams group chat amongst AZ Division employees wherein Chestnut relays a conversation he had with Lemon indicating he got the "low down."

218. Chestnut writes, "UWM stuff is super easy. Broker is a pain because we are working out of a different portal for each. But the loans going to broker are higher qualified borrowers so the loans are pretty clean. [Lemon] Also said March looks A LOT better than February. Have about 70 in the pipe for March at [OneTrust] and 30 at UWM. Hoping to start moving us over one by one soon."

219. CalCon is informed and believes that this evidences Lemon and AZ Division Employee Defendants routing "higher qualified borrowers" away from CalCon to UWM. A true and correct copy of this communication is attached to this Complaint as **Exhibit 24**.

220. Tanei Bain became a CalCon employee and a member of the AZ Division on or about April 1, 2022, and remained employed by CalCon until March 20, 2024.

221. CalCon is informed and believes that T. Bain assisted in the solicitation and onboarding of employees from CalCon to EMC, assisted in the diversion of CalCon borrowers to EMC and UWM, and the onboarding and use of Floify to achieve these ends.

222. One example of T. Bain assisting in the diverting of a loan opportunity away from CalCon to UWM and EMC can be found in an email chain dated March 15, 2024, wherein Ouellette describes what is required by UWM and Tim Potempa indicates that

"we talked about not going UWM." A true and correct copy of this email is attached to this Complaint as **Exhibit 22**.

223. CalCon is informed and believes that this communication reflects the coordinated effort among Defendants to route higher quality loans to UWM or EMC and use the AZ Division Employee Defendants, here T. Bain's assistance in that effort.

224. Danielle Toglena became a CalCon employee and a member of the AZ Division on or about April 1, 2022, and remained employed by CalCon until March 20, 2024.

225. CalCon is informed and believes that Toglena assisted in the solicitation and onboarding of employees from CalCon to EMC, assisted in the diversion of CalCon borrowers to EMC and UWM, and the onboarding and use of Floify to achieve these ends.

226. This is evidenced in emails and teams chats wherein Toglena was trained on the use of Floify while at CalCon and participated in meetings with UWM and EMC.

227. Each of the Defendants' wrongful conduct and the resulting injury continued beyond March 2024, including through the continued processing and funding of diverted loans, continued use of CalCon's Trade Secrets, and continued benefit derived from the recruitment and onboarding of employees from the AZ Division.

228. In late March 2024, CalCon had begun to suspect that certain loan opportunities and borrower information were being diverted away from CalCon.

229. However, at that time CalCon did not know, and could not reasonably determine, the full scope of the diversion scheme, including the volume of affected loans, the extent of third-party involvement, the identity of all participating actors, the precise technological mechanisms utilized, the extent of EMC or UWM's participation, or the full nature and amount of resulting damages.

230. CalCon thereafter conducted internal investigation, loan-level analysis, and third-party discovery efforts which revealed and confirmed that CalCon-originated loan

applications and borrower opportunities were concealed and diverted through unauthorized systems and lending channels associated with EMC and UWM.

231. The full scope, operational details, and extent of Defendants' conduct could not reasonably be determined at that time through ordinary business monitoring or review of CalCon's authorized systems and even now the investigation remains ongoing.

232. Moreover, Defendants' wrongful conduct has been ongoing, including the continued use of CalCon's Trade Secrets and continued processing of diverted loan applications, such that CalCon's claims are timely under applicable law.

**COUNT I – MISAPPROPRIATION OF TRADE SECRETS (DTSA) (18 U.S.C. § 1836(b)(1))**

**AGAINST ALL DEFENDANTS**

233. CalCon incorporates by reference all preceding paragraphs as though fully set forth herein.

234. At all relevant times, CalCon owned and possessed valuable trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1839(3), including but not limited to prospective, current, and former borrower information, non-public borrower documents, loan application and pipeline data, referral-source information, pricing information, internal business methods, operational processes, compensation structures, marketing information, customer relationship data, and technology-related processes and systems used in the origination, processing, routing, and monetization of mortgage loan opportunities.

235. CalCon's Trade Secrets derived independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, competitors and other persons within the mortgage lending industry. Such information enabled CalCon to identify, cultivate, process, preserve, convert, and monetize borrower information and mortgage loan opportunities without incurring the substantial time, expense, operational costs, staffing, marketing expenditures, and

business development efforts otherwise required to independently generate such opportunities.

236. CalCon's Trade Secrets relate to CalCon's mortgage lending and origination services offered and provided in interstate commerce, including mortgage loan activity involving borrowers, lenders, brokers, and transactions in Arizona and other states.

237. CalCon undertook reasonable measures to maintain the secrecy of its Trade Secrets and confidential information, including through Employment Agreements, confidentiality provisions, restrictive covenants, Employee Handbook policies, technology-use restrictions, authentication and access-control measures, employee training, password protections, limitations on authorized system access, and oversight of CalCon's technology systems, borrower-intake systems, and related business infrastructure.

238. Each AZ Division Employee Defendant expressly acknowledged that CalCon's confidential and proprietary information belonged exclusively to CalCon and agreed to utilize such information solely for CalCon's benefit and not to disclose, transfer, misuse, divert, or utilize such information outside CalCon's authorized systems and operations.

239. Upon information and belief, while still employed by CalCon and while owing continuing contractual, fiduciary, confidentiality, and loyalty obligations to CalCon, Defendants acquired, accessed, utilized, disclosed, transferred, preserved, copied, routed, and/or misappropriated CalCon's Trade Secrets through improper means and without CalCon's authorization.

240. Upon information and belief, each AZ Division Employee Defendant utilized unauthorized third-party technology systems and software platforms, including Floify and related systems, to divert CalCon-originated borrower information, loan opportunities, mortgage applications, and related trade secret information outside

CalCon's authorized systems and visibility for the benefit of EMC and associated lending channels involving UWM.

241.   Upon further information and belief, each AZ Division Employee utilized CalCon-authorized digital infrastructure, including the potempateam.com domain and related email systems, to redirect prospective borrowers and related application activity away from CalCon's authorized point-of-sale and application systems and into unauthorized third-party systems associated with EMC or UWM and related lending channels.

242.   Each Defendant knew or had reason to know that the Trade Secrets and confidential information at issue:

(a)  derived independent economic value from not being generally known;

(b) belonged exclusively to CalCon;

(c) were subject to confidentiality, contractual, and fiduciary restrictions; and

(d) were obtained and utilized through improper means and unauthorized conduct.

243.   Upon information and belief, EMC knowingly participated in, encouraged, coordinated, and/or benefited from the acquisition, use, preservation, transfer, routing, processing, and monetization of CalCon's Trade Secrets and confidential borrower information by onboarding each AZ Division Employee, accepting diverted loan opportunities, processing CalCon-originated borrower applications, and utilizing CalCon's confidential business information and borrower relationships for competitive and financial gain.

244.   Upon information and belief, UWM knowingly received, processed, funded, preserved, and/or monetized loan opportunities and borrower information originating from CalCon's systems, personnel, and confidential business relationships while knowing that such opportunities had been diverted through unauthorized conduct involving CalCon's confidential information, borrower information, and loan pipeline activity.

245. Each Defendant used, or aided and abetted, the use of CalCon's Trade Secrets and confidential information to unfairly compete against CalCon, solicit and transition CalCon's employees and borrower information, preserve and monetize diverted loan opportunities, and generate revenue, commissions, competitive advantages, and business opportunities for themselves and others.

246. Each Defendant's conduct was willful, malicious, intentional, and undertaken in conscious disregard of CalCon's rights.

247. As a direct and proximate result of each Defendant's conduct, CalCon has suffered and continues to suffer substantial damages, including loss of borrower relationships, loss of loan opportunities, loss of revenue, loss of goodwill, loss of competitive advantage, investigative costs, and other economic harm in an amount to be proven at trial.

248. Defendants' conduct has caused and threatens to continue causing immediate and irreparable injury to CalCon for which there is no adequate remedy at law.

249. Pursuant to 18 U.S.C. § 1836(b), CalCon is entitled to injunctive relief, compensatory damages, exemplary damages for willful and malicious misappropriation, attorneys' fees, costs, and such further relief as the Court deems just and proper.

## COUNT II – MISAPPROPRIATION OF TRADE SECRETS - ARIZONA UNIFORM TRADE SECRETS ACT (AUTSA) (A.R.S. § 44-401 et seq.) AGAINST ALL DEFENDANTS

250. CalCon incorporates by reference all preceding paragraphs as though fully set forth herein, including the allegations set forth in Count I regarding the nature of CalCon's Trade Secrets, the reasonable measures undertaken to protect such Trade Secrets, and Defendants' acquisition, disclosure, use, preservation, routing, transfer, processing, and monetization of such Trade Secrets through improper means and unauthorized conduct.

251. At all relevant times, CalCon owned valuable Trade Secrets within the meaning of A.R.S. § 44-401, including borrower information, borrower documents, loan

pipeline data, referral-source information, pricing information, compensation structures, internal operational processes, marketing information, customer relationship data, business methods, technology-related processes, and systems utilized in the origination, processing, routing, preservation, and monetization of mortgage loan opportunities.

252. Upon information and belief, each AZ Division Employee Defendant acquired, disclosed, transferred, preserved, copied, routed, used, and/or misappropriated CalCon's Trade Secrets through improper means and without authorization, including through unauthorized third-party systems, diverted borrower-routing activity, coordinated employee solicitation and transition activity, and competing lending channels associated with EMC and UWM.

253. Upon information and belief, EMC knowingly coordinated with, encouraged, participated in, and/or benefited from the misappropriation and use of CalCon's Trade Secrets by onboarding each AZ Division Employee Defendant, accepting and processing diverted loan opportunities, utilizing CalCon-originated borrower information and pipeline information, and monetizing such opportunities for EMC's financial and competitive benefit.

254. Upon information and belief, UWM knowingly received, processed, funded, preserved, and/or monetized loan opportunities and borrower information originating from CalCon's systems, personnel, and confidential business relationships while knowing, or being willfully blind to the fact, that such opportunities had been diverted through unauthorized conduct involving CalCon's Trade Secrets, borrower information, and loan pipeline activity.

255. Each Defendant's acquisition, disclosure, use, routing, preservation, transfer, and monetization of CalCon's Trade Secrets was unauthorized, improper, intentional, and undertaken for Defendants' financial gain and competitive advantage and to CalCon's detriment.

COMPLAINT

256.    As a direct and proximate result of Defendants' conduct, CalCon has suffered and continues to suffer damages, including loss of borrower information, loss of loan opportunities, loss of goodwill, loss of competitive advantage, investigative costs, lost revenue, and other economic harm in an amount to be proven at trial.

257.    Defendants' conduct has caused and threatens to continue causing immediate and irreparable injury to CalCon for which there is no adequate remedy at law.

258.    Pursuant to A.R.S. §§ 44-402 through 44-404, CalCon is entitled to injunctive relief, compensatory damages, exemplary damages for willful and malicious misappropriation, attorneys' fees, costs, and such further relief as the Court deems just and proper.

## COUNT III - VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT (CFAA) (18 U.S.C. § 1030)

### AGAINST EACH AZ DIVISION EMPLOYEE DEFENDANT

259.    CalCon incorporates by reference all preceding paragraphs as though fully set forth herein.

260.    At all relevant times, CalCon's computer systems, networks, databases, cloud-based platforms, website infrastructure, client portals, email systems, servers, and related software applications (collectively, the "Computer Systems") were connected to the internet and used in interstate commerce and communication and therefore constitute "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2).

261.    The Computer Systems stored and processed highly confidential and proprietary information, including borrower and customer data, loan application and pipeline information, referral-source information, pricing and financial data, internal operational information, and other confidential and trade secret business information belonging to CalCon.

262.    Access to CalCon's Computer Systems was restricted by authentication controls, user credentials, access permissions, confidentiality policies, and technology-

use restrictions, and such access was authorized solely for legitimate business purposes conducted on behalf of CalCon.

263. Upon information and belief, while still employed by CalCon and while owing continuing contractual, fiduciary, confidentiality, and loyalty obligations to CalCon, each AZ Division Employee Defendant, acting individually and in concert with others, knowingly and intentionally accessed CalCon's protected Computer Systems in a manner that exceeded the scope of authorized access granted by CalCon.

264. Upon further information and belief, each AZ Division Employee Defendant utilized unauthorized third-party technology systems and software platforms, including Floify and related systems, in connection with CalCon's Computer Systems, including through the unauthorized modification, integration, connection, routing, linking, and/or manipulation of CalCon's website functions, client portals, email systems, application-routing functions, or related borrower intake processes, for the purpose of redirecting borrower traffic, borrower information, loan opportunities, applications, and related data away from CalCon and into lending channels associated with EMC and UWM.

265. Upon information and belief, Floify and related third-party systems were connected to the AZ Division web domain, "potempateam.com," and implemented onto or accessed through AZ Division Employee Defendants' work laptops and related technology systems for the purpose of routing mortgage prospects and related application activity away from CalCon's authorized systems and visibility.

266. During Tim Potempa's employment, CalCon authorized the use of the potempateam.com domain for the furtherance of CalCon's business purposes, specifically to market CalCon's mortgage products and services and to facilitate the borrower intake process. CalCon maintained oversight of the domain, the business activity conducted through it, and integrated the domain into its systems. Though authorized, Tim Potempa only encouraged the AZ Division Employee Defendants to use the domain in place of the

"onetrusthomeloans.com" once it was determined that they would be moving to EMC and a decision was made to connect such domain to Floify to secretly divert loans to UWM and EMC.

267. By way of example, prospective borrowers who expressed interest in obtaining mortgage services through CalCon would submit inquiries through potempateam.com and provide their confidential information for use with completing a mortgage application.

268. Upon information and belief, such borrower information and related borrower activity were routed to "potempateam.floify.com" rather than to CalCon's authorized point-of-sale and application systems.

269. Tim Potempa and AZ Division Employee Defendants would thereafter communicate with such prospects using "potempateam.com" email accounts and provide hyperlinks directing the prospects to potempateam.floify.com to complete their mortgage application, thereby preventing such borrower inquiries and related application activity from entering CalCon's authorized systems and visibility. Floify would then provide e-mail notifications to AZ Division Employee Defendants, notifying them of activity relating to prospective borrowers using such Defendant's potempateam.com e-mail domains.

270. Neither the AZ Division Employee Defendants nor any other unauthorized individuals were permitted by CalCon to alter, connect, integrate, or utilize non-CalCon technology platforms in conjunction with CalCon's protected Computer Systems for the purpose of diverting borrower information, loan opportunities, applications, or related data to a competing mortgage lender while such individuals remained employed by CalCon.

271. Upon information and belief, each AZ Division Employee Defendant, including Defendant Lemon, accessed, copied, transferred, diverted, preserved, routed, manipulated, and/or utilized information maintained within CalCon's protected

Computer Systems, including confidential borrower information, loan-application data, pipeline information, referral-source information, customer-relationship data, marketing information, and other confidential and proprietary business information. CalCon alleges that, to the extent any such Defendant accessed restricted systems, accounts, folders, databases, or electronically stored information beyond the scope of that Defendant's authorized access, such access was without authorization or exceeded authorized access within the meaning of 18 U.S.C. § 1030.

272.    Defendant Ouellette's authorization to access CalCon's Computer Systems and electronically stored information terminated no later than the conclusion of his employment with CalCon on or about February 1, 2024. After that date, while employed by EMC and without authorization from CalCon, Ouellette accessed one or more nonpublic, CalCon-controlled electronic systems or accounts, including but not limited to potempateam.com Google workspace, through which Ouellette obtained CalCon's confidential borrower information, active loan information, supporting loan documentation, pipeline information, and/or related confidential business information.

273.    Upon information and belief, Ouellette accomplished this post-termination access through the Potempateam.com web domain, which CalCon is informed and believes Defendant Grajeda, while employed at CalCon, provided Ouellette with continued access notwithstanding that his authorization terminated with his employment. Despite his lack of authorization, Ouellette engaged with AZ Division Employee Defendants still at CalCon as if they had a common business purpose, which they did, generating mortgage business for UWM or EMC. Ouellette's post-termination access enabled him, EMC, and others acting in concert with them to identify, preserve, transfer, process, and monetize CalCon-originated loan opportunities through EMC and associated UWM lending channels.

274.    Ouellette's post-termination access was undertaken knowingly, intentionally, and without authorization for the purpose of obtaining confidential CalCon

information and loan opportunities for the benefit of EMC and/or UWM and to the detriment of CalCon. Through that unauthorized access, Ouellette obtained information from a protected computer within the meaning of 18 U.S.C. § 1030(a)(2)(C) and, upon information and belief, acted with intent to defraud and obtained things of value within the meaning of 18 U.S.C. § 1030(a)(4).

275. As a direct and proximate result of Ouellette's unauthorized post-termination access, CalCon incurred loss within the meaning of 18 U.S.C. § 1030(e)(11), including costs reasonably incurred in responding to the unauthorized access, investigating the manner and extent of access, conducting forensic review and loan-level analysis, assessing the compromise of CalCon's confidential borrower and pipeline information, and undertaking remedial measures. Such qualifying losses exceeded $5,000 during a one-year period.

276. Upon information and belief, each AZ Division Employee Defendant utilized such information and access to solicit, preserve, transfer, process, fund, and/or monetize mortgage loan opportunities through EMC and UWM lending channels for Defendants' financial benefit and to CalCon's detriment.

277. Each AZ Division Employee Defendant knowingly and intentionally accessed CalCon's protected Computer Systems in excess of the scope of access authorized by CalCon and thereby obtained information from such protected computers, including information having independent economic value to CalCon. AZ Division Employee Defendants knowingly utilized unauthorized access, unauthorized technological integrations, concealed routing activity, and unauthorized diversion mechanisms to obtain diverted loan opportunities, borrower information, commissions, and competitive business advantages.

278. As a direct and proximate result of each AZ Division Employee Defendant's conduct, CalCon incurred losses and damages within the meaning of 18 U.S.C. § 1030(e), including but not limited to:

COMPLAINT

- costs associated with investigating and responding to Defendants' unauthorized conduct;

- forensic review and remediation efforts;

- security review and system analysis;

- disruption to CalCon's business operations;

- loss of loan opportunities, borrower information, and revenue;

- and impairment to the integrity, value, and security of CalCon's Computer Systems and data.

279. Such losses exceed $5,000 in value during a one-year period.

280. CalCon further alleges that each AZ Division Employee Defendant's conduct was inherently concealed through the use of unauthorized third-party systems and routing activity occurring outside CalCon's authorized systems and visibility, such that CalCon could not reasonably determine the full nature, scope, mechanisms, and extent of such Defendant's conduct until subsequent investigation and loan-level analysis.

281. Defendants' conduct constitutes violations of 18 U.S.C. § 1030(a)(2)(C), § 1030(a)(4), and, to the extent applicable, § 1030(a)(5).

282. As a direct and proximate result of Defendants' conduct, CalCon has suffered damages and is entitled to compensatory, equitable, and injunctive relief pursuant to 18 U.S.C. § 1030(g), together with costs and such further relief as the Court deems proper.

**COUNT IV – BREACH OF FIDUCIARY DUTY (ARIZONA COMMON LAW) AGAINST EACH AZ DIVISION EMPLOYEE DEFENDANT**

283. CalCon incorporates by reference all preceding paragraphs as though fully set forth herein.

284. At all relevant times, Tim Potempa and each AZ Division Employee Defendant were employees, managers, officers, and/or agents of CalCon and, by virtue of their positions, owed fiduciary duties and duties of loyalty, honesty, candor, confidentiality, and faithful service to CalCon under Arizona law.

285. Such duties included, among other things, duties:

(a) to act in CalCon's best interests while employed by CalCon;

(b) not to compete with CalCon during employment;

(c) not to divert corporate opportunities, borrower information, loan opportunities, or business activities belonging to CalCon;

(d) not to misuse or disclose CalCon's confidential or trade secret information;

(e) not to solicit CalCon employees for a competing business while employed by CalCon; and

(f) not to utilize CalCon's systems, technology, personnel, borrower information, or business infrastructure for the benefit of a competing enterprise.

286. Upon information and belief, while still employed by CalCon and while owing continuing fiduciary and loyalty obligations to CalCon, each AZ Division Employee Defendant breached those duties by engaging in coordinated efforts to solicit and transition employees, divert borrower information, loan opportunities, mortgage applications, and other Trade Secrets away from CalCon and toward EMC and related lending channels associated with UWM.

287. Upon information and belief, Defendants further breached their fiduciary duties by:

(a) recruiting and soliciting CalCon employees to leave CalCon for EMC while still employed by CalCon;

(b) utilizing unauthorized third-party technology systems, including Floify and related systems, to divert and preserve CalCon-originated borrower information and loan opportunities outside CalCon's authorized systems and visibility;

(c) routing prospective borrower inquiries and application activity away from CalCon's authorized point-of-sale and application systems;

(d)   misusing CalCon's confidential and trade secret information for the benefit of themselves and competing lending channels;

(e)   preserving, transferring, processing, and/or monetizing loan opportunities belonging to CalCon through unauthorized systems and competing lending channels;

(f)   concealing such conduct from CalCon; and

(g)   otherwise placing their personal financial interests and the interests of competing entities above the interests of CalCon while still employed by CalCon.

288.   Upon information and belief, each AZ Division Employee Defendant utilized CalCon-authorized digital infrastructure, including the potempateam.com domain and related email systems, in connection with unauthorized third-party systems and routing activity designed to divert borrower inquiries and mortgage application activity outside CalCon's authorized systems and oversight.

289.   Each AZ Division Employee Defendant knew their conduct was contrary to CalCon's interests and inconsistent with their fiduciary obligations owed only to CalCon.

290.   Each AZ Division Employee Defendant's breach of fiduciary duty was intentional, willful, malicious, and undertaken for such Defendants' financial gain and competitive advantage and to CalCon's detriment.

291.   As a direct and proximate result of each AZ Division Employee Defendant's breach of fiduciary duty, CalCon has suffered and continues to suffer substantial damages, including loss of borrower information, loss of loan opportunities, loss of revenue, loss of goodwill, loss of competitive advantage, investigative costs, and other economic harm in an amount to be proven at trial.

292.   Each AZ Division Employee Defendant's conduct has caused and threatens to continue causing immediate and irreparable injury to CalCon for which there is no adequate remedy at law.

293.  CalCon is therefore entitled to compensatory damages, disgorgement, equitable relief, injunctive relief, costs, and such further relief as the Court deems just and proper.

## COUNT V – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
## (ARIZONA COMMON LAW)
## AGAINST DEFENDANTS EMC AND UWM

294.  CalCon incorporates by reference all preceding paragraphs as though fully set forth herein, including the allegations set forth in Count IV regarding the fiduciary duties owed by each AZ Division Employee Defendant and the breaches of those duties alleged herein.

295.  Upon information and belief, EMC and UWM had actual knowledge, or were willfully blind to the fact, that Potempa, Defendants Ouellette and Lemon, and each AZ Division Employee Defendant owed continuing fiduciary, loyalty, confidentiality, and restrictive covenant obligations to CalCon while employed by CalCon.

296.  Upon information and belief, EMC and UWM further knew, or were willfully blind to the fact, that:

    (a)  Each AZ Division Employee Defendant remained employed by CalCon while coordinating their transition to EMC;

    (b)  CalCon-originated borrower information, loan opportunities, and pipeline activity were being diverted outside CalCon's authorized systems and visibility; and

    (c)  unauthorized systems and technology platforms, including Floify and related systems, were being utilized in connection with the preservation, routing, processing, and monetization of CalCon-originated borrower inquiries, mortgage applications, and loan opportunities.

297.  Upon information and belief, EMC knowingly and substantially assisted and encouraged such breaches of fiduciary duty by:

    (a) recruiting and onboarding AZ Division Employee Defendants while they remained employed by CalCon;

> (b) encouraging and facilitating the solicitation and transition of CalCon employees;
>
> (c) coordinating with each AZ Division Employee Defendant regarding the transfer, preservation, processing, and monetization of CalCon-originated loan opportunities; and
>
> (d) accepting and utilizing CalCon-originated borrower information, mortgage applications, confidential information, and diverted loan opportunities for EMC's financial and competitive benefit.

298. Upon information and belief, UWM knowingly and substantially assisted and encouraged such breaches of fiduciary duty by:

> (a) participating in, facilitating, supporting, and/or knowingly benefiting from communications, onboarding activities, transition efforts, and loan-submission activity involving EMC and each AZ Division Employee Defendant;
>
> (b) knowingly receiving, processing, funding, preserving, and/or monetizing CalCon-sourced loan opportunities through lending channels associated with EMC and UWM; and
>
> (c) continuing to process and fund such loan opportunities despite knowing, or being willfully blind to the fact, that such opportunities originated from CalCon personnel, systems, borrower information, and confidential business activity.

299. Upon information and belief, EMC and UWM provided substantial assistance to each AZ Division Employee Defendant's breach of fiduciary duty and knowingly benefited from the resulting diversion of CalCon employees, borrower information, loan opportunities, confidential information, and business operations.

300. As a direct and proximate result of EMC's and UWM's conduct, CalCon has suffered and continues to suffer substantial damages, including loss of borrower relationships, loss of loan opportunities, loss of revenue, loss of goodwill, loss of

competitive advantage, investigative costs, and other economic harm in an amount to be proven at trial.

301.    EMC's and UWM's conduct was intentional, willful, malicious, and undertaken for financial gain and competitive advantage and to CalCon's detriment.

302.    CalCon is therefore entitled to compensatory damages, equitable relief, injunctive relief, costs, and such further relief as the Court deems just and proper.

### COUNT VI - TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### AND BUSINESS EXPECTANCIES
### (ARIZONA COMMON LAW)
### AGAINST DEFENDANTS EMC AND UWM

303.    CalCon incorporates by reference all preceding paragraphs as though fully set forth herein.

304.    At all relevant times, CalCon maintained valid contractual relationships and business expectancies with its employees, including each AZ Division Employee Defendant, as well as with prospective and existing borrowers, referral sources, and ongoing mortgage loan opportunities and pipeline relationships.

305.    Such contractual relationships included Employment Agreements containing confidentiality provisions, restrictive covenants, non-solicitation obligations, technology-use restrictions, and duties relating to the protection of CalCon's confidential and trade secret information.

306.    At all relevant times, each AZ Division Employee Defendant, including Defendants Ouellette and Lemon, executed Employment Agreements containing express non-solicitation covenants prohibiting them from directly or indirectly soliciting, recruiting, encouraging, or assisting CalCon employees to leave CalCon for a competing mortgage lender, including EMC. Pursuant to Schedule D of those Employment Agreements, employees expressly agreed that during their employment and for eighteen (18) months thereafter, they would not directly or indirectly "employ or solicit for employment any of Company's employees, consultants, or contractors to leave Company;

form or join another entity; and/or sever (or cause the termination of) his/her relationship with Company." The agreements further prohibited employees from advising or assisting "any other person or entity that is a Competing Organization."

307. CalCon also maintained valid business expectancies in its ongoing borrower relationships, prospective loan applications, mortgage pipeline opportunities, referral relationships, and related business opportunities generated through CalCon's systems, personnel, marketing efforts, confidential business information, borrower-intake infrastructure, and ongoing lending operations.

308. Upon information and belief, EMC and UWM knew of such contractual relationships and business expectancies, including the continuing employment, contractual, fiduciary, confidentiality, and restrictive covenant obligations owed by each AZ Division Employee Defendant to CalCon.

309. Upon information and belief, EMC and UWM further knew, or were willfully blind to the fact, that:

(a) Each AZ Division Employee Defendant remained employed by CalCon while coordinating their transition to EMC;

(b) CalCon-originated borrower information, loan opportunities, and pipeline activity were being diverted outside CalCon's authorized systems;

(c) Each AZ Division Employee Defendant remained subject to confidentiality, non-solicitation, fiduciary, and loyalty obligations owed to CalCon; and

(d) unauthorized systems and technology platforms, including Floify and related systems, were being utilized in connection with the diversion, preservation, processing, and routing of CalCon-originated borrower inquiries, mortgage applications, and loan opportunities.

310. Upon information and belief, EMC knowingly utilized Tim Potempa, Defendants Cory Ouellette, Andrew Lemon, and each AZ Division Employee Defendant to recruit, solicit, coordinate, transition, and onboard CalCon employees for employment

with EMC while such individuals remained employed by CalCon and remained subject to express contractual non-solicitation, confidentiality, fiduciary, and loyalty obligations owed to CalCon.

311. Upon information and belief, EMC knew, or was willfully blind to the fact, that each AZ Division Employee Defendant was prohibited by their Employment Agreements from directly or indirectly soliciting CalCon employees to leave CalCon for a competing mortgage lender, including EMC, during their employment and for a specified period thereafter. Despite such restrictions, EMC coordinated with each AZ Division Employee Defendant regarding recruitment efforts, onboarding logistics, employee transition activity, compensation structures, and related business operations involving CalCon employees.

312. Upon information and belief, EMC intentionally interfered with CalCon's contractual relationships and business expectancies by:

(a) recruiting and onboarding AZ Division Employee Defendants while they remained employed by CalCon;

(b) encouraging, facilitating, coordinating, and accepting the solicitation and transition of CalCon employees in violation of each AZ Division Employee Defendant's restrictive covenants and continuing duties owed to CalCon;

(c) coordinating with each AZ Division Employee Defendant regarding the transfer, preservation, processing, and monetization of CalCon-originated loan opportunities;

(d) accepting and processing borrower information and mortgage applications diverted from CalCon;

(e) utilizing and benefiting from CalCon's confidential and trade secret information;

(f) facilitating the continued routing and processing of diverted mortgage applications through EMC-associated lending channels; and

(g) encouraging and benefiting from the coordinated migration of each AZ Division Employee Defendant and other CalCon employees to EMC while such individuals continued to access CalCon systems, borrower information, loan opportunities, confidential information, and business infrastructure for EMC's benefit.

313. Upon information and belief, EMC's coordinated recruitment and onboarding efforts were undertaken in conjunction with the diversion and preservation of CalCon-originated borrower information, loan opportunities, and mortgage applications so that such opportunities could later be processed, funded, and monetized through EMC and associated UWM lending channels following each AZ Division Employee Defendant's departure from CalCon.

314. Upon information and belief, UWM intentionally interfered with CalCon's contractual relationships and business expectancies by:

(a) participating in, facilitating, supporting, and/or knowingly benefiting from communications, onboarding activities, transition efforts, and loan-submission activity involving EMC and each AZ Division Employee Defendant;

(b) knowingly receiving, processing, preserving, funding, and/or monetizing loan opportunities originating from CalCon borrower relationships and pipeline activity;

(c) providing lending channels and wholesale lending infrastructure through which diverted CalCon-originated loan opportunities could be processed, funded, preserved, and monetized; and

(d) continuing to process and fund such loan opportunities despite knowing, or being willfully blind to the fact, that such opportunities originated from CalCon personnel, systems, borrower relationships, and confidential business activity.

315. EMC's and UWM's conduct was intentional, improper, wrongful, malicious, and undertaken for financial gain and competitive advantage and to CalCon's detriment.

316. As a direct and proximate result of EMC's and UWM's interference, CalCon has suffered and continues to suffer substantial damages, including loss of employees, loss of borrower relationships, loss of mortgage loan opportunities, loss of pipeline activity, loss of goodwill, loss of competitive advantage, lost revenue, investigative costs, and other economic harm in an amount to be proven at trial.

317. EMC's and UWM's conduct has caused and threatens to continue causing immediate and irreparable injury to CalCon for which there is no adequate remedy at law.

318. CalCon is therefore entitled to compensatory damages, equitable relief, injunctive relief, costs, and such further relief as the Court deems just and proper.

**COUNT VII – CIVIL CONSPIRACY**

**(ARIZONA COMMON LAW)**

**AGAINST ALL DEFENDANTS**

319. CalCon incorporates by reference all preceding paragraphs as though fully set forth herein.

320. Beginning in or around late 2023, Tim Potempa, Defendants EMC and UWM, Defendants Ouellette and Lemon, and each AZ Division Employee Defendant knowingly agreed, acted in concert, and participated in a coordinated scheme and common course of conduct to divert employees, borrower information, loan opportunities, mortgage applications, confidential information, Trade Secrets, and related business operations away from CalCon and toward EMC and associated lending channels involving UWM.

321. Upon information and belief, Defendants shared a common objective to:

(a) recruit and transition CalCon employees to EMC;

(b) divert and preserve CalCon-originated borrower information and loan opportunities;

(c) utilize CalCon's confidential and trade secret information for competitive and financial advantage; and

(d) unfairly compete with CalCon through coordinated and unauthorized conduct.

56
COMPLAINT

322. In furtherance of the conspiracy alleged herein, Defendants committed numerous overt acts, including:

(a) coordinating the recruitment, solicitation, onboarding, and transition of each AZ Division Employee Defendant and other CalCon employees to EMC while such individuals remained employed by CalCon;

(b) utilizing unauthorized third-party systems, including Floify and related systems, to divert borrower inquiries, mortgage applications, and loan opportunities outside CalCon's authorized systems and visibility;

(c) redirecting prospective borrower inquiries and related application activity away from CalCon's authorized systems;

(d) preserving, processing, funding, and monetizing CalCon-originated loan opportunities through EMC and associated UWM lending channels;

(e) utilizing and benefiting from CalCon's confidential and trade secret information; and

(f) concealing the nature and scope of Defendants' conduct through unauthorized systems and off-platform routing activity.

323. Upon information and belief, EMC knowingly coordinated with each AZ Division Employee Defendant regarding employee recruitment, onboarding, transition activity, and the handling of CalCon-originated borrower information and loan opportunities while such individuals remained employed by CalCon and subject to continuing contractual, fiduciary, confidentiality, and restrictive covenant obligations owed to CalCon.

324. Upon information and belief, UWM knowingly participated in, facilitated, supported, and/or benefited from loan-submission activity, lending operations, funding activity, and related conduct associated with diverted CalCon-originated loan opportunities processed through EMC-associated lending channels.

325. The acts undertaken in furtherance of the conspiracy included, among other things:

(a) misappropriation of Trade Secrets;

(b) breach of fiduciary duty and duty of loyalty;

(c) aiding and abetting breaches of fiduciary duty;

(d) tortious interference with contractual relations and business expectancies;

(e) violations of the Computer Fraud and Abuse Act, as applicable to certain Defendants; and

(f) other unlawful, wrongful, and improper conduct alleged herein.

326. As a direct and proximate result of Defendants' conspiracy and concerted conduct, CalCon has suffered and continues to suffer substantial damages, including loss of employees, loss of borrower relationships, loss of loan opportunities, loss of revenue, loss of goodwill, loss of competitive advantage, investigative costs, and other economic harm in an amount to be proven at trial.

327. Defendants' conduct has caused and threatens to continue causing immediate and irreparable injury to CalCon for which there is no adequate remedy at law.

328. CalCon is therefore entitled to compensatory damages, equitable relief, injunctive relief, exemplary damages to the extent permitted by law, costs, and such further relief as the Court deems just and proper.

### COUNT VIII – UNJUST ENRICHMENT
### (ARIZONA COMMON LAW)
### AGAINST ALL DEFENDANTS

329. This claim is pled in the alternative. CalCon incorporates by reference all preceding paragraphs as though fully set forth herein.

330. At all relevant times, CalCon expended substantial resources, time, labor, technology, personnel, marketing expenditures, operational infrastructure, borrower-intake systems, confidential business information, referral relationships, and goodwill to develop, cultivate, preserve, and maintain its workforce, borrower relationships, mortgage pipeline activity, loan opportunities, referral sources, and related business operations.

331. Upon information and belief, Defendants knowingly obtained, accepted, retained, preserved, processed, funded, utilized, and/or monetized benefits originating from

CalCon's employees, borrower relationships, confidential information, mortgage applications, loan opportunities, and related business operations.

332. Upon information and belief, while still employed by CalCon and while owing continuing contractual, fiduciary, confidentiality, and loyalty obligations to CalCon, each AZ Division Employee Defendant coordinated with EMC and others to transition employees, borrower information, loan opportunities, mortgage applications, and pipeline activity away from CalCon and toward EMC and associated UWM lending channels.

333. Upon information and belief, each AZ Division Employee Defendant utilized unauthorized third-party technology systems and software platforms, including Floify and related systems, to preserve, divert, process, route, maintain, and/or monetize CalCon-originated borrower inquiries, mortgage applications, loan opportunities, and related confidential business information outside CalCon's authorized systems and visibility.

334. Upon further information and belief, prospective borrower inquiries and mortgage application activity originating through CalCon-authorized systems, personnel, marketing efforts, and borrower-intake infrastructure were redirected and routed through unauthorized systems and thereafter preserved, processed, funded, and monetized through EMC and associated UWM lending channels.

335. Upon information and belief, EMC knowingly accepted and benefited from:
    (a) the coordinated migration of each AZ Division Employee Defendant and other CalCon employees;
    (b) CalCon-originated borrower information and loan opportunities;
    (c) diverted mortgage applications and pipeline activity;
    (d) CalCon confidential and trade secret information;
    (e) the preservation and processing of CalCon-originated loan opportunities through EMC lending channels; and
    (f) the resulting commissions, revenue, competitive advantages, and business opportunities generated thereby.

336. Upon information and belief, UWM knowingly accepted, processed, funded, preserved, and/or monetized loan opportunities and mortgage applications originating from

CalCon borrower information, systems, personnel, confidential business information, and pipeline activity through wholesale lending channels associated with EMC and UWM.

337.    Each Defendant's receipt and retention of such benefits was unjust because the benefits were obtained through improper, unauthorized, wrongful, and inequitable conduct, including the diversion of CalCon-originated business opportunities, misuse of CalCon confidential and trade secret information, breaches of fiduciary and loyalty obligations, unauthorized technological routing activity, and interference with CalCon's contractual relationships and business expectancies.

338.    As a direct and proximate result of Defendants' conduct, CalCon has suffered substantial damages, including loss of borrower relationships, loss of mortgage loan opportunities, loss of revenue, loss of pipeline activity, loss of goodwill, loss of competitive advantage, investigative costs, and other economic harm in an amount to be proven at trial.

339.    Each Defendant has been unjustly enriched at CalCon's expense and, in equity and good conscience, should not be permitted to retain the benefits obtained through the conduct alleged herein.

340.    CalCon is therefore entitled to restitution, disgorgement of profits and benefits unjustly obtained, equitable relief, costs, and such further relief as the Court deems just and proper.

### PRAYER FOR RELIEF

WHEREFORE, CalCon respectfully requests judgment against each Defendant as follows:

A.    For compensatory damages according to proof;

B.    For restitution and disgorgement of all profits, commissions, compensation, revenues, and benefits unjustly obtained by Defendants;

C.    For exemplary and punitive damages to the extent permitted by law, including under the DTSA and AUTSA;

D.    For temporary, preliminary, and permanent injunctive relief prohibiting Defendants from using, disclosing, transferring, routing, preserving, processing, retaining, or monetizing CalCon's Trade Secrets, confidential

information, borrower relationships, loan opportunities, and related business information;

E.    For injunctive relief prohibiting further solicitation of CalCon employees in violation of restrictive covenants and fiduciary obligations;

F.    For a constructive trust over improperly diverted loan proceeds, commissions, revenues, and related benefits derived from the conduct alleged herein;

G.    For attorneys' fees and costs pursuant to A.R.S. § 12-341.01, § 12-341, and Paragraph 11 of the Employment Agreements;

H.    For pre-judgment and post-judgment interest as permitted by law; and

I.    For such other and further legal and equitable relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a jury trial.

Dated: June 3, 2026                          **BRODY | GAPP LLP**

                                             /s/ Nathan J. Kunz
                                             Nathan J. Kunz
                                             Scott M. Harkless

                                             *Attorneys for Plaintiff CalCon Mutual Mortgage,*
                                             *LLC dba OneTrust Home Loans*